**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal Case No. 23-cr-122-2 (APM)** |
| **v.** | : | |
| | : | |
| **STEVEN PRICE, *et al.*,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**
**AS TO DEFENDANT KEIDI MOORE**

The United States, by and through the undersigned attorneys, hereby submits this Memorandum to aid the Court in sentencing Defendant Keidi Moore ("Defendant Moore" or "Moore") and to provide the Government's recommendation for sentencing, which is currently scheduled for October 23, 2026.

Defendant Moore spent years of her dental hygienist career perpetrating a multi-million fraud on D.C. Medicaid, a program designed to help our community's most vulnerable. Between 2017 and 2022, she took advantage of her special skills as a licensed dental hygienist to conspire with her employer Dr. Steven Price ("Defendant Price") to defraud D.C. Medicaid of millions of dollars by using patients' dental records to submit false claims to be paid out by the social program. After being charged in this criminal case, Defendant Moore made false statements in an administrative proceeding in order to retain her dental hygienist license and keep working at other practices. After a six-week trial, Defendant Moore was found guilty by a jury of her peers. She has shown no remorse nor accepted responsibility for her actions. The Government respectfully recommends that the Court impose a sentence of **57 months' imprisonment**—the low-end of the applicable U.S. Sentencing Guidelines range according to the Government's computation—along

with a three-year term of supervised release, $3,726,529 in restitution to D.C. Medicaid[1] and a $40,000 criminal forfeiture money judgment.

## I. PROCEDURAL HISTORY

On April 13, 2023, a federal grand jury in Washington D.C. returned a 21-count Indictment charging Defendants Price and Moore with conspiracy, in violation of 18 U.S.C. § 1349, health care fraud, in violation of 18 U.S.C. §1347; false statements relating to health care matters, in violation of 18 U.S.C. § 1035(a)(2); wire fraud, in violation of 18 U.S.C. § 1343; and aiding and abetting and causing an act to be done, in violation of 18 U.S.C. § 2. *See* ECF No. 1. The Indictment also contained a forfeiture allegation. *Id.*

A jury trial commenced on January 20, 2026. On March 4, 2026, after a nearly six-week trial, involving over thirty-five witnesses, including former patients and employees, law enforcement agents, and fact and expert witnesses, a jury found Defendant Moore guilty of a jury found Defendant Moore guilty of 16 out of a 21-count indictment charging conspiracy to commit healthcare fraud and wire fraud, healthcare fraud, false statements relating to healthcare matters, and wire fraud.[2] The jury acquitted Defendant Moore on Count Three - false statements relating to healthcare matters (Patient No. 4408 – November 26, 2018); Count Seven - false statements relating to healthcare matters (Patient No. 807 – July 1, 20219 to July 9, 2019); Count Eleven - false statements relating to healthcare matters (Patient No. 4456 – April 12 2021); Count 16 – wire fraud (Patient Nos. 807 and 5313 – July 11, 2019); and Count Twenty – wire fraud (Patient No. 4456 – April 14, 2021)

---

1 Restitution should be ordered to be paid jointly and severally with Defendant Price.

2 Co-Defendant Price was convicted on all counts in the Indictment.

On September 17, 2026, the Court held a hearing on the loss amount associated with Defendants' fraudulent scheme and then imposed a sentence on Defendant Price. The Government's computation of loss—supported by evidence admitted at trial, along with additional memoranda of interview by two dentists—was based on the $3,726,529 D.C. Medicaid paid out for the two fraudulent codes used in the conspiracy.[3] Nevertheless, the Court concluded that the loss was only $3,441,835. The Government maintains its objection to the Court's loss determination and makes its recommendation (set forth in this filing) based on the $3,726,529 figure that, in the Government's view, is supported by the record.[4]

To reflect the seriousness of Defendant Moore's conduct, her lack of remorse, and to deter her and others from engaging in such behavior in the future, the Government recommends that the Court impose a term of incarceration at the low end of the U.S.S.G. range of **57-71** months' imprisonment based on a total offense level of **25** for the offense, which is within Zone D of the Guidelines. *See* PSR at ¶¶ 87, 96. A sentence of 57 months' imprisonment—the bottom of that Guideline's range—along with the imposition of a term of 36 months supervised release, is appropriate considering the U.S.S.G. calculation and all of the 18 U.S.C. § 3553 factors the Court should review and consider. The Government is also requesting that the Court order Defendant to pay full restitution to Medicaid in the amount of $3,726,529, jointly and severally with her co-

3 The total amount paid by Medicaid for the two CDT codes that were falsely entered was over $4 million. *See* ECF No. 226; *see also* Government's Memoranda in Aid of Sentencing at 18. Nevertheless, the Government reduced the amount by 11% based on evidence in the record about the possibility of that margin having actually been performed on patients.

4 The Court further concluded that the Government had not proven by a preponderance of the evidence that Defendant Price had directed or managed the criminal conduct of Defendant Moore. The Government maintains an objection to that finding as well and, as discussed below, recommends that the Court make an adjustment for Defendant Moore's minor role in the case.

defendant. Pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 9982(a)(7), and 28 U.S.C. § 2461(c), and because Defendant received proceeds of the conspiracy and fraud scheme, the Court should impose a criminal forfeiture money judgement in the amount of $40,000, based upon the eleven round dollar payments made to Defendant Moore by the Smile Center between June 2022 and December 2022, after the Smile Center was ostensibly closed. See Exhibit No. 600-60. There are also $1,600 in special assessments mandated by 18 U.S.C. § 3013(a)(1)(A)(iii), (a)(2)(A), that Defendant should be ordered to pay. Such a sentence would be sufficient but not greater than necessary to comply with the purposes of sentencing. Defendant Moore's sentencing hearing is scheduled for October 23, 2026.

## II. FACTUAL BACKGROUND

Co-Defendant Price was the owner of The Smile Center LLC ("The Smile Center"), a dental practice in Washington, D.C. At trial, the Government put on evidence showing that Co-Defendant Price conspired with his dental hygienist, Defendant Keidi Moore, to submit millions of dollars' worth of fraudulent claims to D.C. Medicaid relating to two particular dental services: a clinical crown lengthening procedure (CDT Code "D4249" or "CCL") and an appliance, a fixed unilateral space maintainer (CDT Code "D1510").

Evidence at trial further showed that Defendant Moore knew that her employer was adding false CCL codes to patient charts so that false claims were ultimately submitted to Medicaid. But rather than report the fraud, she joined it—and she came up with her own variation by adding false fixed unilateral space maintainer codes to patient charts and providing an additional basis for fraudulent Medicaid reimbursement.

The Smile Center's millions of dollars in billing for these two procedures dwarfed other Medicaid providers serving the same community — all of whom had similarly-sized, or even

larger, practices. For example, as shown in Government's Exhibit No. ("Gov. Exhibit No.") 600-53, admitted into evidence at trial, the Smile Center was the highest reimbursed provider in D.C. for D4249 in years 2018 to 2021—and the next nine-highest reimbursed Medicaid providers for D4249 billed a mere fraction of the Smile Center's numbers:




The Government also admitted evidence from D.C. Medicaid related to billing for D1510, which showed a similar pattern. *See* Gov. Exhibit No. 600-50 below. The Smile Center was also an outlier regarding claims for D1510 code.




| Procedure Code | Procedure Code Description |
|---|---|
| D1510 | Space Maintainer – Fixed, Unilateral – Per Quadrant |

Footnotes:

1. Source: Listing from DHCF of the highest reimbursed providers of procedure code D1510
2. Time Period Covered: 2016 - 2021
3. This shows the amount reimbursed by DC Medicaid for the top 10 highest reimbursed providers for procedure code D1510 for each year. The highest reimbursed providers may not be the same providers each year.

GOVERNMENT EXHIBIT
600-50

Evidence admitted in the Government's case-in-chief from the Smile Center's dental records software program, Open Dental, showed that both Defendants Price and Moore entered thousands of procedures each under codes D4249 and D1510 for patients of The Smile Center that did not occur. *See e.g.,* Gov. Exhibit Nos. 201-210, 600-55, 722. Summary exhibits provided information regarding both the creation and deletion of D1510 and D4249 entries in the Open Dental records. *See e.g.,* Gov. Exhibit Nos. 600-55 below; 2/9/2026 Tr. 2335.

**Total Number of Entries for D4249 & D1510**
**Attributable to Each User**

| User | Activity | 2017 | 2018 | 2019 | 2020 | 2021 | 2022* | TOTAL |
|---|---|---|---|---|---|---|---|---|
| drprice | Created | 905 | 2,906 | 2,870 | 1,575 | 342 | 8 | 8,606 |
| | Deleted | 19 | 319 | 350 | 86 | 21 | | 795 |
| Kmoore | Created | 93 | 768 | 2,566 | 1,735 | 1,012 | 6 | 6,180 |
| | Deleted | 43 | 470 | 636 | 176 | 95 | 14 | 1,434 |
| Aporter | Created | 11 | 11 | 3 | 11 | 6 | 2 | 44 |
| | Deleted | 61 | 300 | 432 | 106 | 35 | 2 | 936 |
| Nallen | Created | | | 10 | 31 | | | 41 |
| | Deleted | | | 13 | 2 | | | 15 |
| Mthompson | Created | | | 21 | 8 | | | 29 |
| KKClarke | Created | | | | 24 | | | 24 |
| | Deleted | | | | 1 | | | 1 |
| Fbrown | Created | | 5 | 2 | | | | 7 |
| | Deleted | | 4 | 11 | | | | 15 |
| Yetta Galiber | Created | | | | | 2 | 8 | 10 |
| sthompson | Created | | | | | 1 | | 1 |
| | Deleted | | | | 2 | 1 | | 3 |
| Oangole | Created | | | 2 | | | | 2 |
| Saugustus | Created | 1 | | | | | | 1 |

| Procedure Code | Procedure Code Description |
|---|---|
| D1510 | Space Maintainer – Fixed, Unilateral – Per Quadrant |
| D4249 | Clinical Crown Lengthening - Hard Tissue |

Footnotes:

1. Source: Open Dental audit trail
2. Time Period Covered: 1/1/2017 – 3/22/2022

GOVERNMENT EXHIBIT
600-55

*See also* Government's Exhibit No. 600-59. As reflected in this exhibit, both Defendants created a significant number of entries for D4249 and D1510 codes, particularly compared to the other

dentists. This exhibit also shows that both defendants deleted some of their entries.[5] *See Id*. Audit trails from individual patient charts showed that the codes D4249 and D1510 for clinical crown lengthening and fixed unilateral space maintainers were often entered by Defendant Moore during routine appointments for dental hygiene services, such as cleanings and fluoride treatment, *see, e.g.*, Gov. Exhibit. No. 202 (audit trail of Patient No. 5126 at 58), while Co-Defendant Price entered some codes during appointments, some after business hours, and/or when other dentists saw patients *see, e.g.*, Gov. Exhibit Nos. 205, 207. Records also demonstrated that during the fraud scheme, Defendant Price and Defendant Moore created entries for D4249 and D1510 on the same patient multiple times and frequently on the same tooth. *See* Government Exhibit No. 206-3 below.[6]

---

5 Other then the officer manager's testimony that the early deletions by her and Defendant Moore were: 1) to avert Co-Defendant Price from getting in trouble for perpetrating the fraud scheme; and 2) to avoid too many D1510 codes so as to not be detectable, there is no evidence as to why either Defendant deleted entries. 2/10/2026 Tr. 2749, 2751, 2754-57.

6 The individual mouth charts admitted into evidence, such as Gov. Exhibit No. 206-3 were visual summaries of data contained in patients' dental record and showed the number of the entries that were ultimately billed to Medicaid for that patient, and included the purported: date, tooth number, type of dental service - (CCL) for D4249 and (SM) for D1510, and identity of username - (KM) for Defendant Moore and (SP) for Co-Defendant Price. *See e.g.* Gov. Exhibit Nos. 201-3A, 206-3; 2/11/2026 Tr. 3061-3064.




A similar pattern was seen throughout the Smile Center's patients' records. *See e.g.*, Gov. Exhibit Nos. 201-3A, 202-3, 203-2A, 204-3A, 205-3, 207-3A, 209-3A, 210-2A.

In addition, records showed that Defendants had started these patterns in approximately 2018—after they had been working together at The Smile Center for several years before that, without entering the two codes so frequently — and they both stopped entering the two codes at the same time in August 2021, when D.C. Medicaid let Co-Defendant Price know that going forward, D4249 had a pre-authorization requirement. *See, e.g.*, Gov. Exhibit Nos. 3-17 (August 2, 2021, email from D.C. Medicaid to Co-Defendant Price regarding pre-authorization requirement); Gov. Exhibit No. 600-75 (D4249 entries by Defendants in 2021), and Gov. Exhibit Nos. 600-73 (D1510 entries by Defendants in 2021). Although there was no pre-authorization requirement for claims involving D1510, both Defendants stopped making entries for D1510.

Patient witnesses from The Smile Center testified and confirmed that they did not recall undergoing the types of procedures Defendants entered into their records. One witness recalled

viewing her patient history containing procedures she did not recognize and reacting "that [expletive] was crazy!" *See* 1/30/2026 Tr. 947. Several former employees of The Smile Center testified, including two who recalled seeing patients and then later realizing that Defendant Price had added codes for D4249 into their patient charts (even though no clinical crown lengthening procedures had occurred during the appointments). *See e.g.,* Gov. Exhibit No. 205; 2/3/2026 Tr. 1399-1405.

Multiple dental providers testified that that CDT Code D1510 was for a fixed unilateral space maintainer – a metal band with a wire to hold open space for an erupting adult tooth in children. *See e.g*. 2/2/2026 Tr. 1043. The appliance was cemented onto a tooth. *Id*. The Smile Center staff knew that the D1510 code was for a fixed mouth appliance for children. 2/2/2026 Tr. 1012. Defendant Moore created more than $500,000 worth of D1510 entries for adults whose average age was 50. *See* Gov. Exhibit Nos. 600-49, 600-50.

Dental health providers, including the Government's expert witness, periodontologist Dr. Martyn Green, testified that the purpose of a D4249, or the CCL procedure, was to elongate the tooth by removing gum tissue and bone so there was more tooth structure was exposed to place a crown or filling. 2/2/2026 Tr. 1024-1026. Dr. Green testified that a CCL should not be done without subsequent restorative procedure. *Id*. at 1026. According to the Government's experts and the American Dental Association's CDT Code, the D4249 Code requires the creation of a flap in the gum and exposing the tooth root through removal of bone.[7] 1/30/2026 Tr. 837-838.

7 Defendant Price's expert agreed that D4249 Code states that a flap is part of the CCL procedure, but that he did not agree with the American Dental Association's codes. 2/17/2026 Tr. 4041.

*See e.g.* Gov. Exhibit No. 801; 2/2/2026 Tr. 1061. Dr. Antonio Lacey also testified that he would expect a restorative procedure after a clinical crown lengthening. 1/30/2026 Tr. 849-850. Indeed, the CDT Code manual describes D4240 clinical crown lengthening as "[t]his procedure is employed to allow a restorative procedure on a tooth with little or no tooth structure exposed. . . crown lengthening requires reflection of a full thickness flap and removal of bone, altering the crown to root ratio. . . " Gov. Exhibit No. 801. The Smile Center's patient records and evidence at trial, however, showed that only 11 % of the CCL procedures were followed by an expected restorative procedure, such as a crown or a filling, within 60 days of the CCL procedure. *See* Government's Exhibit No. 600-52. Dentists also testified that they would not expect a patient to have a CCL procedure the same day as a hygiene treatment such as teeth cleaning. 2/2/2026 Tr. 1033; 2/2/2026 Tr. 1076. Dr. Green also testified that a D4249 and D1510 should not be done on the same day. 2/3/2026 Tr. 1046. "You wouldn't want any cement to get under the flap or irritate the surgery from healing." *Id*.

Associate dentists and the Smile Center's office manager testified that they noticed Co-Defendant Price entering codes for procedures that had not occurred in patients' charts.[8] *See e.g.* 2/9/202 Tr. 2424-27; 2/9/2026 Tr. 2439; 2/4/2026 Tr. 1559-1561. The office manager talked to Co-Defendant Price about it, but he never gave her a straight answer. 2/9/2026 Tr. 2413-2436. The office manager also testified about printing a report (of the Smile Center's daily entries) from Open Dental and going over the report with Defendant Moore "because [Defendant Moore] would have more knowledge on whether a procedure should be done or not done than I would . . . she

8 There was evidence from the records and testimony that the Defendants' scheme to defraud began when the Smile Center was located on Kennedy Street. *See e.g.*, 2/3/2026 Tr 1454; Gov. Exhibit No. 722.

would say, it's no way you could have done that or this couldn't have been done." 2/9/2026 Tr. 2436. Early on in Co-Defendant Price's scheme to defraud Medicaid, the officer manager and Defendant Moore reviewed the daily reports, and they deleted entries that they knew were fraudulent. 2/9/2026 Tr. 2429-3.

Yet, Defendant Moore began adding procedures to patients' charts too. "Well, yes, she was adding procedure codes as well . . .she was adding the code – it was like an ortho code [ ] . . . [i]t was the same code over and over" *Id*. at 2437. In addition, the office manager testified that ". . .I mentioned to her [Defendant Moore] that I thought she was overusing that code and that she might want to stop." *Id*. at 2438. When the office manager raised these concerns of Defendant Moore's excessive use of D1510 code with Defendant Moore she responded, "Why?" 2/9/2026 Tr. 2493. The office manager responded, "I hold her, you know, they might start getting flagged through Medicaid because it seems like she is using it an excessive amount of times." *Id*. After this discussion with Defendant Moore, Co-Defendant Price approached her and responded on Defendant Moore's behalf, "Then as soon as she told Dr. Price, because he came to me and he said that Keidi had mentioned to him what I said, he said she could justify it. So, I said, okay." *Id*. at 2494.

Although evidence at trial showed that Defendant Price often entered false CCL codes into patient charts after hours, Defendant Moore sprinkled her false CCL and fixed unilateral space maintainer codes amongst codes for other procedures such as topical application of fluoride and removable appliance therapy. For example:

| | | | | | | |
|---|---|---|---|---|---|---|
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D0170, Fee: 40.00, re-evaluation - limited, problem focused (established patient; not post-operative visit) |
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | ProcCompleteEdit | TSC-OP1 | D0290 (C), Fee: 140.00, posterior-anterior or lateral skull and facial bone survey radiographic image |
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | ProcCompleteEdit | TSC-OP1 | D0330 (C), Fee: 68.00, panoramic radiographic image |
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D8210, Fee: 441.00, removable appliance therapy |
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D8210, Fee: 441.00, removable appliance therapy |
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D8210, Fee: 441.00, removable appliance therapy |
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D8210, Fee: 441.00, removable appliance therapy |
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | RecallEdit | TSC-OP1 | Recall updated by Recall Synch. |
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D1110, Fee: 69.00, prophylaxis - adult |
| 06/24/2021 | 12:30 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D1208, Fee: 25.00, topical application of fluoride |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D4249, Teeth: 26, 25, 24, 23, Fee: 396.00, clinical crown lengthening - hard tissue |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D4249, Teeth: 26, 25, 24, 23, Fee: 396.00, clinical crown lengthening - hard tissue |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D4249, Teeth: 26, 25, 24, 23, Fee: 396.00, clinical crown lengthening - hard tissue |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcComplCreate | TSC-OP1 | D4249, Teeth: 26, 25, 24, 23, Fee: 396.00, clinical crown lengthening - hard tissue |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcCompleteEdit | TSC-OP1 | D1110 (C), Fee: 69.00, prophylaxis - adult |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcCompleteEdit | TSC-OP1 | D1208 (C), Fee: 25.00, topical application of fluoride |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcCompleteEdit | TSC-OP1 | D4249 (C), Fee: 396.00, clinical crown lengthening - hard tissue |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcCompleteEdit | TSC-OP1 | D4249 (C), Fee: 396.00, clinical crown lengthening - hard tissue |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcCompleteEdit | TSC-OP1 | D4249 (C), Fee: 396.00, clinical crown lengthening - hard tissue |
| 06/24/2021 | 12:31 PM | 5313-[redacted] | Kmoore | ProcCompleteEdit | TSC-OP1 | D4249 (C), Fee: 396.00, clinical crown lengthening - hard tissue |

Gov. Exhibit No. 210 at 55.

The evidence at trial was that Defendant Moore did not stop entering D1510 and D4249 codes to patient's charts until the end of July/beginning of August 2021, when Co- Defendant Price and the office manager were notified of the pre-authorization requirement for CCL procedures. *See e.g.*, Gov. Exhibit Nos. 600-73 (a portion below), 600-75, showing the near cessation of D1510 entries in August 2021.

**# of D1510 Entries Created**

| User | Activity | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kmoore | Created | 71 | 29 | 87 | 57 | 41 | 64 | 4 | | 4 | | | | 357 |
| drprice | Created | | | | | | | | | | | | | |

Footnotes:

1. Source: OpenDental Audit Trail
2. Time Period Covered: 1/1/2021 – 12/31/2021
3. Only reflects D1510 entries created by users Kmoore and drprice.

GOVERNMENT EXHIBIT
600-73

In total, between January 2017 and March 2022, D.C. Medicaid paid the Smile Center for the D4249 and D1510 codes entered into patient charts by Defendants Price and Moore—amounting to fraud on a taxpayer-funded social program of at least $3,726,529.

## III. STATUTORY PENALTIES

Each count of wire fraud (Counts 13-21) has a statutory maximum punishment of twenty years' incarceration. 18 U.S.C. § 1343; PSR ¶ 30, 85. The maximum statutory punishment on Counts 1 and 2 – conspiracy to commit health care fraud, and health care fraud – is ten years' incarceration.[9] PSR ¶¶ 83, 84. Counts 4-6, 8-10, and 12 – false statements relating to a health care matter's maximum statutory penalty is five years' incarceration. 18 U.S.C. § 1035(a)(2); PSR ¶ 85.

9 The jury found the object of the defendant's conspiracy to be health care fraud. *See* ECF No. 189.

## IV. APPLICABLE SENTENCING GUIDELINES

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for a sentencing determination. *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Cano-Flores*, 796 F.3d 83, 90 (D.C. Cir. 2015) ("[T]he first step for the sentencing court is to calculate the [Sentencing Guidelines] range"). While 18 U.S.C. § 3553(a) instructs the Court to "impose a sentence sufficient, but not greater than necessary to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2), the defendant's Guidelines range is one factor the Court must consider in determining an appropriate sentence. 18 U.S.C. § 3553(a)(4). Facts supporting the base offense level and any enhancements are proven by the government by a preponderance of the evidence. *See, e.g.*, *United States v. West*, 392 F.3d 450, 454 (D.C. Cir. 2004).

According to the Presentence Report, the U.S. Sentencing Guidelines calculation for Defendant's offenses are grouped based upon the highest charge of wire fraud and aiding and abetting and causing an act to be done, in violation of 18 U.S.C. § 1343(2) and 2. 3D1.2; PSR ¶¶ 28-29.

The Government's Guidelines' calculation is as follows:

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(1) | Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(b)(1)(J) | Loss Amount +$3,500,000 | +18 |
| U.S.S.G. § 2B1.1(b)(7) | Health Care Fraud +1,000,000 | +2 |
| U.S.S.G. § 3B1.3 | Abuse of Trust and Use of a Special Skill | +2 |
| U.S.S.G. § 3B1.2(b) | Minor Participant | -2 |
| | Total | **27** |

Because there are multiple counts that are closely related, pursuant to U.S.S.G. §3D1.2, there is only one group. Therefore, the combined offense level is **27**. The PSR writer also concluded (and the Government agrees) that Moore has a criminal history score of zero, putting her in Criminal History Category I, and that Moore meets the criteria under U.S.S.G. §§ 4C1.1(a)(1)-(10), for a two-point adjustment due to being a Zero Point Offender. This results in a total offense level of **25**, and an applicable Guidelines range of **57-71** months' imprisonment.[10]

The Government will discuss below why the Guidelines enhancements under U.S.S.G. §§ 3B1.3 and 3B1.1(C) apply to Moore's guidelines' calculation as well as how they factor into the Court's consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a).

## V. GOVERNMENT'S RECOMMENDATION

### A. Analysis of the Sentencing Factors under Section 3553(a)

After calculating the applicable Guidelines range, the Court should next consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). Indeed, the Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in Section 3553(a). *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007). The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the nature and circumstances of the offense, the history and characteristics of the

10 The PSR writer did not include an adjustment pursuant to U.S.S.G. § 3B1.3 for Defendant Moore's use of a special skill, so the total offense level in the PSR is 23, corresponding to a Guidelines range of 46-57 months' imprisonment.

defendant, the kinds of sentences available, the sentencing range under the Guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

*1. Nature and Circumstances of the Offense and Its Seriousness*

This Court has already determined that the criminal scheme caused more than $3 million of harm to D.C. Medicaid. *See* ECF No. 231 at 7. However, as set forth in the Government's Reply to Defendant Moore's Memorandum on Loss at Sentencing, Defendant Moore should be criminally responsible for the full scope of loss caused by the conspiracy. *See* ECF No. 226at 10-14. This is because the record shows that Defendant Moore knew about Defendant Price's false entries before she joined the conspiracy, the scope of the agreement included her entering false codes for fixed unilateral space maintainers *and* clinical crown lengthening procedures (even though the latter is outside the scope of her license), and the evidence shows that the co-conspirators acted in concert throughout the scheme. *Id.* None of Defendant Price's conduct was concealed from her—in fact, the testimony at trial was that she was typically in the office more than he was. Moreover, the individual patient audit trails which were entered as trial exhibits demonstrate that Defendant Moore reviewed patients charts regularly before seeing patients and could not have been oblivious to the false entries of Defendant Price.

Aside from the monetary harm caused by the false claims Medicaid paid out, Defendant Moore's conduct caused a host of other specific and general harms. The individual patients Defendant Moore saw for hygiene appointments do not have accurate dental records to rely on for future medical and dental care.[11] Moreover, fraudulent billing schemes like this one undermine

---

11 Indeed, the Court heard from patients whose medical records were "crazy" with incorrect information. Defendant Moore's actions certainly will impact patients' and their new

public confidence in social programs and threaten the future funding of D.C. Medicaid and programs like it.

Despite the fact that Defendant Moore repeatedly entered false information into patient charts—including for procedures that were beyond the scope of her license—and caused millions of dollars to be fraudulently paid out from D.C. Medicaid, the Government respectfully submits that the evidence admitted at trial supports an adjustment for Defendant Moore's minor role in the offense. Specifically, Defendant Price was the enrolled D.C. Medicaid provider who supervised Defendant Moore's work. As shown by the records admitted at trial, Defendant Price began entering codes before Defendant Moore did—and he apparently directed that the scheme end in July 2021 after receiving notification from D.C. Medicaid that CCLs would require pre-authorization. As the Medicaid provider, Defendant Price approved Defendant Moore's false entries in patients' medical records before they were submitted as claims to Medicaid, thereby deciding which false entries to bill. Defendant Price had sole discretion over Defendant Moore's employment, including the amount of her salary and bonus. The facts show that he orchestrated her participation in the conspiracy and then benefitted from it more than she did. Therefore, an adjustment is appropriate to account for Defendant Moore's role relative to Defendant Price. *See* U.S.S.G. § 3B1.2(b); see also Application Note 3 ("[A] defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline.").

---

providers ability to determine what dental services they actually received from the Smile Center – either for future treatment or billing reasons.

*2. History and Characteristics of the Defendant*

Defendant Moore comes from a supportive family, including brothers who live nearby and a husband who quit his job to be a paralegal at her trial. *See* PSR ¶¶ 47-57. She excelled in school and earned honors for her academic achievements. Defendant Moore was educated – she received a degree from Howard University. Initially, when she became a dental hygienist in 2010, she used her talents for good: seeing patients at the Smile Center, including many elderly and disabled patients who were Medicaid recipients. But Smile Center records show that in about 2017, she began participating in a scheme to add false codes to patient charts so that they could be submitted for D.C. Medicaid reimbursement. In other words, she used her talents to help perpetuate a massive fraud on a public program designed to help people, and she used the patients entrusted to her care to do so without a thought of how her fraudulent acts might impact them.[12]

She would not have been able to effectively perpetuate this fraud if she had not been a licensed dental hygienist—that is, in possession of special skills that are not possessed by the general public. *See* U.S.S.G. § 3B1.3, Application Note 4 ("'Special skill'" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."). Accordingly, a two-point enhancement for use of a special skill applies.

Defendant Moore has not accepted responsibility for her actions nor shown any remorse. Quite to the contrary, Defendant Moore continued her self-serving false statements in this investigation and prosecution of this case. In April 2022, when law enforcement executed a search

---

12 The officer manager's testimony about her discussions with Defendant Moore centered around the possible impact of Defendant Price's false billing on Defendant Price – not on how the false entries in patient records might impact patient care.

warrant at the Smile Center, Defendant Moore was interviewed and asked questions about her entry of information into patient charts. She told federal agents that she did not enter CDT codes into Open Dental. *See* Memorandum of Interview dated April 5, 2022 at 2.[13] But the evidence at trial showed that Defendant Moore entered thousands of codes into Open Dental during her patient examinations, and the jury's verdict includes convictions for entering false codes into numerous patient charts. *See* ECF No. 189. Defendant Moore also told investigators that she did not know if Defendant Price submitted for services he did not render. *See* Memorandum of Interview dated April 5, 2022 at 2. But the office manager testified at trial that years before this she and Defendant Moore reviewed reports of patient charts into which Defendant Price had entered false information.[14] *See* Feb. 9 TR. 2426:8-11, 2429:8-2430:11, 2434:3-2438:8.

After the indictment in this case, Defendant Moore's license was suspended and she petitioned to have it reinstated. The matter was heard before Administrative Law Judge Mary Masulla on January 9, 2023, and January 10, 2023. Defendant Moore testified in the proceedings under oath that she had never performed work outside the scope of her license, including specifically denying having recemented crowns, performed occlusal adjustments, performed gingival flaps, clinical crown lengthening, pulp vitality tests. *See* Transcript of Proceedings, 2021-R-03177, January 10, 2023, 51-61.[15] The Open Dental records of Defendant Moore's

13 This Memoranda will be offered into the record at the sentencing hearing but could be provided to the Court earlier upon request.

14 Further, Defendant Moore's defense team has argued in pleadings and at trial that Defendant Moore cannot possibly be guilty because she deleted false codes entered by Defendant Price.

15 This transcript will be offered into the record at the sentencing hearing but could be provided to the Court earlier upon request.

appointments tell a starkly different story: that she input codes for all of those procedures into patient charts amongst appropriate dental hygiene codes for fluoride treatments and teeth cleanings. *See, e.g.*, Gov. Exhibit No. 210 at 27-29, 38, 66.

Further, Defendant Moore testified that she never helped cover up any fraud. *See id.* at 66:22-25 (Q: Okay. And have you attempted at any point in the period that an issue here otherwise to conceal any fraudulent activity in the treatment of any patients? A: No, I have not.). Despite this (and despite the fact that Defendant Moore's license was reinstated because the administrative judge credited Defendant Moore's false testimony), through counsel, Defendant Moore has repeatedly argued in these proceedings that she is not culpable based on the fact that she intentionally deleted some of the fraudulent codes entered by Defendant Price.

*3. Need to Deter Similar Conduct and Promote Respect for the Law*

As described above, the facts gathered in this investigation show that Defendant Moore has no issue making false claims in order to further her own gains. She did it by adding false codes to patient charts, and she continued to do it after investigators started asking questions. She apparently still has her dental hygienist license. PSR ¶ 75. If she receives a slap on the wrist for this conduct, what does it say to the patients who were used by the defendants for greed, or the D.C. and federal taxpayers who fund D.C. Medicaid? How do policymakers convince the public to fund social programs when those like Defendant Moore who engage in long-running theft from those programs merely lose their license and suffer administrative consequences? Dental health providers—and other providers giving care to D.C. Medicaid patients—must know that engaging in fraud is not worth it. Providers like Defendant Moore must see that falsifying patient records and causing the submission of false claims to a health care benefit program will cost them more than just potentially the loss of a license and a fine.

*4. The Need to Avoid Unwarranted Sentencing Disparities*

Concerning unwarranted sentencing disparities, a sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

Defendant Moore's Co-Defendant was sentenced to a significantly below-Guidelines sentence of 24 months' imprisonment. Other post-trial defendants in cases of similar magnitude have faced significant prison sentences:

- *United States v. Isaia Okoh*, No. 24-cr-20141 (JEL) (E.D. Mich.) (pharmacist sent false claims for prescription drugs that were not ordered by a doctor and were not dispensed to the patient, caused more than **$6 million of loss** to federal and state health care benefit programs, pleaded guilty and sentenced to **80 months**).
- *United States v. Patrick Moore*, 22-cr-00014 (JRH) (S.D. Ga.) (defendant conspired to cause submission of false Medicare claims for medically unnecessary genetic tests; conspiracy billed $24 million to Medicare, **$7.2 million** of which was paid out; pleaded guilty and sentenced to **46 months**).
- *United States v. Kouza et al.*, 20-cr-20430 (GAD) (E.D. Mich.) (pharmacist sentenced to eight years for falsely billing Medicare and Medicaid for prescription medications that were not dispensed, conspired with brother to cause **$15 million of loss**, sentenced after partial verdict to **96 months**).

- *United States v. Nabil Fakih*, No. 19-cr-20285 (MAG) (E.D. Mich.) (former pharmacist billed Medicare for prescription medications that he did not dispense causing loss of **$4** million; pleaded guilty and sentenced to **46 months**).

In the Government's view, a Guidelines sentence avoids unwarranted disparities.

**B. Restitution**

The crime of wire fraud is an "offense[s] against property under" Title 18, and thus falls under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. As a result, the Court must order that "the defendant make restitution to the victim of the offense[s]." 18 U.S.C. § 3663A(a)(1). The sentencing court determines the amount lost by a preponderance of the evidence. 18 U.S.C. § 3664(e). Defendant owes restitution to D.C. Medicaid in the amount of loss caused by the criminal conspiracy, as proven by the Government in sentencing proceedings in the amount of $3,726,524.

**C. Forfeiture Money Judgment**

"Criminal forfeiture is not an independent substantive offense, nor is it even an element of an offense. It is instead 'an aspect of punishment imposed following conviction of a substantive criminal offense.'" *United States v. Day*, 416 F. Supp. 2d 79, 84 (D.D.C. 2006) (quoting *Libretti v. United States*, 516 U.S. 29, 39 (U.S. 1995)), aff'd in part on other grounds and rev'd in part on other grounds, 524 F.3d 1361 (D.C. Cir. 2008). Criminal forfeiture may take the form of: (1) an *in personam* money judgment against the defendant; (2) forfeiture of specific assets; and (3) forfeiture of "substitute assets" if the directly forfeitable assets are unavailable. *United States v. Zorrilla-Echevarria*, 671 F.3d 1, 5-6 (1st Cir. 2011) (citation omitted). Federal Rule of Criminal Procedure 32.2 governs criminal forfeitures. Pursuant to 18 U.S.C. § 982(a)(7), 18 U.S.C. § 1343, and 21 U.S.C. § 2461(c), the Government respectfully requests that the Court impose a forfeiture

money judgment against Defendant in the amount of proceeds that she received from the fraud conspiracy and scheme. The Government presented evidence at trial that Defendant Moore received eleven even dollar checks from the Smile Center after the practice basically shut down – a total of $40,000 between June 2022 and December 2022. *See* Government Exhibit No. 600-60. Therefore, the Government requests a forfeiture money judgment in that amount against Defendant Moore. A proposed order of forfeiture will be presented to the Court at the time of sentencing.

## VI. CONCLUSION

For the reasons set forth above, the Government respectfully recommends that the Court sentence Defendant Moore to a sentence of **57 months' imprisonment**, which is the low end of the applicable Guidelines range, and a three year term of supervised release, along with restitution to D.C. Medicaid and a criminal forfeiture money judgment.

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By /s/ *Sarah C. Ranney*

DIANE G. LUCAS, D.C. Bar No. 443610
SARAH RANNEY, N.Y. Bar No. 5050919
Assistant United States Attorneys
601 D Street NW
Washington, DC 20530
202-252-7724 (Lucas)
202-252-7051 (Ranney)
Diane.Lucas@usdoj.gov
Sarah.Ranney@usdoj.gov